**ORIGINAL**

**FILED**
JUL 17 2015
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JULIET MARINE SYSTEMS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | No. **15- 747 C** |

## COMPLAINT

### NATURE OF THE CASE

1. Plaintiff Juliet Marine Systems, Inc. ("JMS") brings this action pursuant to 35 U.S.C. § 183 for its damages resulting from the United States Government's imposition of Secrecy Orders on JMS's patent applications.

### PARTIES

2. Plaintiff JMS is a maritime development and manufacturing company located at 62 Deer Street, Portsmouth, New Hampshire 03801. Gregory Sancoff is the founder and Chief Executive Officer of JMS and the inventor of GHOST, a high-speed surface marine vessel that utilizes several innovative technologies. Mr. Sancoff assigned ownership interest in GHOST-related patents and inventions to JMS, which applied for and received the following patents covering such inventions: United States Patents Nos. 8,408,155, issued on April 2, 2013; 8,857,365, issued on October 14, 2014; and 8,683,937, issued on April 1, 2014, with several additional patents pending.

3. Defendant is the United States of America ("the Government").

1

## JURISDICTION AND VENUE

4. Jurisdiction and venue in this Court is proper under 35 U.S.C. § 183.

## FACTUAL BACKGROUND

5. In 2006, JMS began conducting research to develop a high-speed, supercavitating marine vessel with dynamic stability control that would be buffered from the waves and other ocean movements via its SWATH (small waterplane area twin hull) design. This research led to the development of a GHOST prototype in 2009.

6. JMS applied for patents with regard to the innovative technology used in GHOST in 2008 and 2009, application numbers: (1) 61/132,184 ("'184") on June 16, 2008; (2) 61/200,284 ("'284") on November 26, 2008; (3) 12/485,848 ("'848") on June 16, 2009; and (4) US09-047566 on June 16, 2009 ("GHOST patent applications").

7. On October 27, 2009, at the United States Navy's ("Navy") request, the U.S. Patent and Trademark Office ("USPTO") issued Secrecy Orders covering the four GHOST patent applications pursuant to 35 U.S.C. § 181. The USPTO rescinded the Secrecy Orders on March 15, 2010. At the instruction of the Navy, JMS continued to operate as if the Secrecy Orders were still in effect.

8. On August 30, 2010, USPTO reinstated the Secrecy Orders. The Secrecy Orders remained in effect until June 9, 2011, at which point the USPTO rescinded the Secrecy Orders for a second and final time. The Secrecy Orders were in effect for a total of approximately 15 months, and included the same restrictive provisions each time they were imposed.

9. The Secrecy Orders instructed the patent applicants, as well as their heirs, assignees, licensees and their attorneys and agents to keep secret the "subject matter" of the GHOST patent applications based on the Navy's opinion that "unauthorized disclosure" of the subject matter would be "detrimental to the national security." The Secrecy Orders prohibited

disclosure of the patent applications' subject matter to any person except as authorized in the Secrecy Orders or as "subsequently authorized by written modification of [the] Secrecy Order[s] granted by the Commissioner of Patents & Trademarks." A "Permit for Disclosing to Government Employees and Other Specified Persons" ("Permit A") attached to the Secrecy Orders specifically limited disclosure of the patent applications' subject matter to Government officers or employees, their authorized designees, and "the minimum necessary number of persons of known loyalty and discretion, employed by or working with the principals or their licensees and whose duties involve[d] cooperation in the development, manufacture or use of the subject matter by or for the Government of the United States, provided such persons [were] advised of the issuance of [the] Order[s]."

10. The Secrecy Orders required JMS to safeguard the subject matter of the GHOST patent applications "under conditions that [would] provide adequate protection and prevent access by unauthorized persons," including by destroying copies of the subject matter when no longer needed "by a method that [would] prevent disclosure of the contents or reconstruction of the document." The Secrecy Orders further directed that any patent application that contained "any significant part of the subject matter" covered by the Secrecy Orders, and that was not then under a Secrecy Order, to be brought to the "immediate attention" of the Commissioner of Patents. Failure to comply with the Secrecy Orders could result in forfeiture of JMS's inventions or penalties up to and including two years of imprisonment under 35 U.S.C. §§ 182 and 186.

11. JMS undertook extensive efforts to comply with the Secrecy Orders' strict restrictions regarding disclosure of the subject matter of the GHOST patent applications.

12. The imposition of the Secrecy Orders caused JMS significant damages. The Secrecy Orders stalled the development of the GHOST prototype, the subsequent development

of JMS technology, and the growth of JMS by placing restrictions on JMS's ability to test and market the GHOST technology. Sea trial testing, for example, which was necessary to the development of the technology and integral to the full development and marketability of GHOST, was not feasible under the Secrecy Orders due to the mandate to keep secret the subject matter of the GHOST patent applications.

13. The Secrecy Orders also severely restricted JMS's ability to engage with business partners, investors, and potential customers with respect to the GHOST technology. Due to the restrictive nature of the Secrecy Orders, JMS was unable to share important details about the GHOST technology, which limited its ability to raise funding, hire employees, and form business partnerships for continuing technology maturity, material sourcing, and serial production planning. The Secrecy Orders' restrictions were particularly crippling for JMS, a small company with only a handful of employees, because they came at a critical point in GHOST's development when JMS was seeking outside partners and investors.

14. But for the imposition of the Secrecy Orders, JMS could have presented a seaworthy GHOST and the innovative GHOST technologies to interested partners as early as November of 2009, initiated testing and development of the prototype, and greatly increased the likelihood of locking in crucial development funding, and subsequent production orders.

15. Due to the restrictions placed upon JMS by the Secrecy Orders, JMS was unable to develop its technology in a timely manner, obtain needed investor funding, and enter into crucial business partnerships. If not for the imposition of the Secrecy Orders, JMS would have been able to test and develop GHOST technology, engage with much-needed investors and business partners at a critical point in the development of GHOST, and realize profits from sales of GHOST and the GHOST technology resulting therefrom. Without the benefit of essential

business partners and outside investors, JMS had to expend its own funds and obtain loans for continuing research and further development of GHOST technology, which it would not have done but for the Secrecy Orders.

16. The USPTO eventually issued patents for all four patent applications covered by the Secrecy Orders in 2013 and 2014. USPTO issued the following patents to JMS: (1) 8,408,155 on April 2, 2013; (2) 8,857,365 on October 14, 2014; and (3) 8,683,937 on April 1, 2014.

## COUNT

17. JMS incorporates by reference paragraphs 1 through 16 above as if fully set forth herein.

18. Under 35 U.S.C. § 183, "the owner of any patent issued upon an application that was subject to a secrecy order issued pursuant to [35 U.S.C.] section 181 . . . shall have the right, after the date of issuance of such patent, to bring suit in the United States Court of Federal Claims for just compensation for the damage caused by reason of the order of secrecy. . . ."

19. JMS was damaged by the Secrecy Orders imposed on the '184, '284, '848, and US09-047566 patent applications.

20. Imposition of the Secrecy Orders practically prevented JMS from entering into partnerships and joint ventures with private companies and foreign governmental entities, which would have allowed JMS to raise the funds necessary for continued research and advancement at a critical point in GHOST's development.

21. Because JMS was unable to solicit and secure partners at this crucial point, it was forced to incur the costs to further the development of GHOST, which constitutes out-of-pocket damages resulting from the Secrecy Orders.

22. Because JMS was unable to solicit and secure partners at this crucial point, progress on the development of GHOST was significantly hindered and JMS was unable to begin selling boats to commercial customers, the Government, and foreign governments in the time initially anticipated by JMS. As a result, JMS lost significant GHOST sales.

23. The Government has not offered or provided JMS with any compensation of the damages JMS suffered as a result of the Secrecy Orders.

24. JMS prays for judgment in its favor against the Government for just compensation in an amount to be determined at trial, together with costs, reasonable attorneys' fees and other relief as the Court deems just.

Dated: July 17, 2015

Respectfully submitted,

*Robert K. Huffman* by *Thomas P. McLish*
Robert K. Huffman
rhuffman@akingump.com
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4000 (Tel)
(202) 887-4288 (Fax)
Attorney for Juliet Marine Systems, Inc.

Of Counsel:

Scott M. Heimberg
  sheimberg@akingump.com
Thomas P. McLish
  tmclish@akingump.com
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4000 (Tel)
(202) 887-4288 (Fax)
Attorney for Juliet Marine Systems, Inc.